IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
November 19, 2019 Session

**STATE OF TENNESSEE v. TIMOTHY DWAYNE ISON, ALIAS**

**Appeal from the Criminal Court for Knox County**
**No. 106155      G. Scott Green, Judge**

_____

**No. E2018-02122-CCA-R3-CD**

_____

The Defendant, Timothy Dwayne Ison, alias, was convicted by a jury of first degree premeditated murder, for which he received a sentence of life imprisonment without the possibility of parole. On appeal, the Defendant argues (1) that there was insufficient evidence to support his conviction, specifically, challenging the element of premeditation, and (2) that evidence from social media posts was improperly admitted. After a thorough review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and JAMES CURWOOD WITT, JR., JJ., joined.

Gerald L. Gulley, Jr. (on appeal), and Susan E. Shipley (at trial), Knoxville, Tennessee, for the appellant, Timothy Dwayne Ison, alias.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Charme P. Allen, District Attorney General; and Leslie A. Nassios and Kyle Hixson, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
FACTUAL BACKGROUND

The victim, Stefany A. Fairbanks, was stabbed and killed on May 3, 2015, while she was walking along the Third Creek Greenway in Knoxville, Tennessee. Thereafter, on August 19, 2015, a Knox County grand jury charged the Defendant with the first degree premeditated murder of the victim. See Tenn. Code Ann. § 39-13-202. The Defendant proceeded to a jury trial held on May 8th through 11th of 2017.

At the Defendant's trial, the State adduced the following proof. Leslie Price testified that on May 3, 2015, she was employed at the Breadbox convenience store on Sutherland Avenue in Knoxville. Ms. Price identified the Breadbox's location on a map, as well as indicating on the map the location of the entrance to the Third Creek Greenway from Sutherland Avenue.

Ms. Price said that at approximately 6:24 p.m. that evening, a man came into the store wearing blue jeans and a green t-shirt with "little designs on it, [l]ike lines or something." The man purchased a can of tobacco dip. According to Ms. Price, the man seemed "a little nervous," and when he left the store, he told Ms. Price "to be safe, watch [her] back." As this man exited the store, Ms. Price noticed that he had a knife clipped onto his back pocket. Ms. Price identified a still photograph of the Defendant obtained from the store's surveillance system; the photograph was admitted as an exhibit.

Michael Tress testified that he worked with the victim at Massage Envy in Bearden and that they worked together on May 3, 2015, until the establishment closed at 6:00 p.m. According to Mr. Tress, "[t]hat day was just like every other Sunday"; the victim appeared happy; and before leaving, the victim changed and got ready to go for her regular walk on a nearby greenway. The victim gave Mr. Tress a ride to a local bar prior to her proceeding to the greenway; they exchanged pleasantries as Mr. Tress exited the vehicle. Mr. Tress further testified that he was not aware of any issues in the victim's personal life and that he did not know the Defendant.

Esther Griffith testified that she was riding bicycles with Roderick Haynes near West High School on Sutherland Avenue on May 3, 2015. Shortly after turning onto the Third Creek Greenway off of Sutherland Avenue, Ms. Griffith saw a young woman walking towards her from a distance away, and the woman was accompanied by a man who was walking "like a half a step behind" her. Ms. Griffith described the man as Caucasian, having "a very buzzed haircut," and wearing blue jeans and a green shirt with a design on it. As they approached the woman, the woman started to scream and pulled away from the man before stumbling off of the walkway onto the grass and falling down. Ms. Griffith said that the man who had been walking with the woman then turned around and calmly walked in the opposite direction. Ms. Griffith, who was a nurse, jumped off of her bike and ran towards the victim to administer medical assistance. Mr. Haynes followed suit.

As Ms. Griffith attempted to aid the victim, she told Mr. Haynes to call 911, which he did. The 911 recording was played for the jury and entered as an exhibit. In the recording, Mr. Haynes informed the operator that he did not get a good look at the perpetrator; however, he was able to describe that the man was Caucasian and "husky" and was wearing green camouflage. Mr. Haynes was unsure how old the perpetrator was,

but he could be heard asking others present, who told him that the man was in his forties and balding.

Ms. Griffith testified that she saw the victim had been cut or stabbed multiple times, with "muscle tissue hanging" and blood squirting and pooling. Mr. Haynes said that he "saw blood just everywhere." Though Ms. Griffith attempted to hold pressure on the victim's open wounds, she believed that this would be ineffective given the severity of the victim's wounds. According to Ms. Griffith, the victim quickly turned white, as well as began to gurgle, so Ms. Griffith knew that the victim was going to die. Shortly after the 911 call, first responders arrived and observed that the victim had no pulse and pronounced her dead on the scene.

Mr. Haynes testified that after he called 911, he got back on his bicycle and followed the man he had seen walking with the victim. Mr. Haynes described that the Caucasian man was wearing "green and black . . . [l]ike camouflage stripes" and had sandy-blonde colored hair in "a buzz" or "military cut." According to Mr. Haynes, the man began to run away from him, but the man was not headed towards the direction of the Sutherland Avenue entrance. When the man later turned left off of the Greenway, Mr. Haynes lost sight of him. Mr. Haynes returned to Ms. Griffith and the victim briefly before going to the Sutherland Avenue entrance to assist the authorities in locating them. After the ambulance had arrived, Mr. Haynes was prohibited from returning to the scene, so he remained in the parking lot at the Sutherland Avenue entrance. While he was speaking with an officer, Mr. Haynes looked to his left and was surprised to notice the man that he had followed from the scene now walking into the parking lot. Mr. Haynes informed the officer that this was the man he had observed with the victim. Mr. Haynes walked past the man, who had gotten inside his vehicle and was attempting to leave, and Mr. Haynes recognized the man's distinctive green shirt.

Skyler McClurkin testified that on May 3, 2015, between 6:00 and 7:00 p.m., he and his girlfriend were walking along the Third Creek Greenway with their dog when they passed a Caucasian man wearing a green shirt with "a black design on the chest" and blue jeans. According to Mr. McClurkin, the man, who was "[a] little scruffy," having "a 5:00 shadow," appeared very calm and did not cause Mr. McClurkin any alarm. As Mr. McClurkin and his girlfriend walked on, they encountered a police officer about ten minutes later who told them to get off the greenway for safety reasons. As they began walking home, they met another police officer who informed them of the stabbing and told them that the police were "looking for a man in a green camouflage shirt and blue jeans who just ran off into the woods." Mr. McClurkin wanted to help, so he provided the police officer with a description of the man that they had previously seen walking on the greenway.

Knoxville Police Department ("KPD") Lieutenant James Settlemyer testified that he arrived at the Sutherland Avenue entrance around 7:53 p.m. When Lieutenant Settlemyer arrived, the suspect was still at large, and a "BOLO" had been issued to be on the lookout for a white male with "salt and pepper hair" wearing camouflage and blue jeans. After Lieutenant Settlemyer exited his vehicle, a man wearing a green shirt with "some sort of a design on it" walked from across the street and asked one of the officers to move his vehicle so that the man, the Defendant, could get his car out and leave. The Defendant got inside his vehicle.

While Lieutenant Settlemyer was obtaining some identifying information from the Defendant before he left, KPD Officer Chris Morgan came over to the vehicle. Officer Morgan had been informed that there was a man matching the description of the potential suspect in the parking lot. Officer Morgan testified that he approached the Defendant and asked the Defendant a few questions, and the Defendant told him that he had been "out exercising on Sutherland Avenue." Officer Morgan noticed that the Defendant was sweating, was breathing heavily, and had scratch marks up and down his arms. In compliance with a request from Officer Morgan, the Defendant got out of his vehicle. Officer Morgan now saw bloodstains on the Defendant's shirt.

The Defendant consented to a search of his person. Officer Morgan handcuffed the Defendant and detained him. The Defendant was placed in the back of a police car at approximately 8:00 p.m., and his cell phone was confiscated. According to Officer Morgan, as well as several other officers present, the Defendant appeared calm during this interaction.

KPD Sergeant Colin McLeod was the lead investigator in this case, and he was dispatched to the area at 7:26 p.m. that evening. While en route, Sergeant McLeod was informed that the victim was deceased. Upon arrival, he viewed the victim's body—she was lying face down; she had been stabbed multiple times; and she was wearing clothing typical for jogging or exercising. There was no indication that the victim had been robbed, according to Sergeant McLeod. Sergeant McLeod also observed a blood trail that led approximately thirty feet away from the victim's body to an area where they located the victim's cell phone.

Sergeant McLeod began interviewing witnesses. There were three vehicles in the greenway's parking lot that were non-law-enforcement vehicles. Sergeant McLeod was able to identify the owners of those vehicles—one was the victim's, one was the Defendant's, and the other was owned by an individual that the officers ruled out as a suspect.

Sergeant McLeod was informed that a suspect matching the description given by witnesses had appeared in the parking lot of the Third Creek Greenway and that the

suspect had been detained after attempting to leave in his vehicle. Approximately thirty to forty-five minutes after being informed that the suspect had been detained, Sergeant McLeod took Mr. McClurkin to the vehicle in which the twenty-four-year-old Defendant had been placed. Although Mr. McClurkin did not recognize the face of the man in custody in the police cruiser, Mr. McClurkin was able to affirmatively state that the clothing of the man matched the clothing worn by the man whom he had passed on the greenway a short time earlier.

According to Sergeant McLeod's description of the Defendant, the Defendant was "a mixed-race male," who appeared to be physically fit, and he was "[f]airly stout" and "[k]ind of thick chested and shouldered" with "[l]arge arms and large hands." Sergeant McLeod later learned that the Defendant "worked as a pipe layer at Hurst Excavating[.]" Relative to the Defendant's appearance on the evening of May 3, 2015, Sergeant McLeod said that the Defendant was "wearing a green shirt that had an odd pattern on it, blue jeans, kind of a little scruffy, unshaven face." Furthermore, Sergeant McLeod observed what appeared to be multiple spots of blood on the Defendant's clothes, as well as scratches and red marks on the Defendant's arms and neck.

Sergeant McLeod subsequently questioned the Defendant at the police station. The recording of the Defendant's interview was played for the jury. Although the Defendant admitted that he purchased a can of dip at the Breadbox and was walking on Third Creek Greenway around the time the victim was stabbed, he denied any involvement in the crime. The Defendant also claimed that his scratches and red marks were injuries he sustained in the performance of his construction job and that the substance on his clothing was likely oil instead of blood. In Sergeant McLeod's opinion, the Defendant's demeanor was nonchalant during the interview; the Defendant did not appear to be concerned despite his present circumstances; and the Defendant answered questions in an ambivalent manner. The Defendant was also photographed, and the pictures showed the various scratches and red marks on the Defendant. In addition, law enforcement bagged the Defendant's clothes and shoes for scientific analysis; that subsequent analysis revealed the presence of the victim's blood on his left shoe, on his jeans, and on at least four different locations on his t-shirt.

Sergeant McLeod testified that he examined the victim's cell phone. Upon his examination of the victim's phone, Sergeant McLeod did not observe any contacts or text messages with anyone having the Defendant's name, nor did he find any calls or text messages to or from the Defendant's telephone number. Sergeant McLeod also executed a search warrant on the Defendant's cell phone and looked at various types of information contained therein—contacts, phone numbers, data sets, and images. According to Sergeant McLeod, no one with the victim's name was stored as a contact in

the Defendant's phone, and there did not appear to be any contact between the Defendant and the victim.

Sergeant McLeod also noted that the Defendant's phone had a micro SD card for digital storage, and he downloaded the contents from the card. On the micro SD card, Sergeant McLeod discovered a JPEG image from May 3, 2015, at 7:43 p.m. that showed what appeared to be the Defendant's neck, taken at close range, and reflected redness and a scratch.

Sergeant McLeod also "searched site information" from the Google Chrome account that was linked to the phone. He was able to discern that Facebook was accessed "through [the Defendant's] Chrome user" via the phone on May 3, 2015. Sergeant McLeod testified that using his own computer, he searched the internet for a possible Facebook account of the Defendant's and discovered a publicly accessible Facebook account under the name of "Dwayne lson." Sergeant McLeod testified that he printed out a copy of the Facebook account, and he opined that the profile picture on the account was a photograph of the Defendant's son. Sergeant McLeod confirmed the last post to the Facebook account said "walkin aint no joke." The printout reflected the account user's birthdate as May 20, 1990, and it showed "7 hrs" above the last post "walkin aint no joke." Several other posts and photographs were included in the printout. The printout, as well as a blown-up picture of the last post, were admitted into evidence as properly authenticated.

Following an objection from the defense, Sergeant McLeod was permitted to testify about the contents of the posts to the Facebook account. He was again shown the printout from the challenged Facebook account and confirmed the identifying details provided on the account, including the name "Dwayne Ison," the account user's birthdate, which Sergeant McLeod determined to be the Defendant's, and the profile picture of the Defendant's son. Sergeant McLeod testified that from the download of the Defendant's micro SD card, he observed a photograph that had been taken of "a cut pipe, mud, and water" underground with a time and date stamp of April 30, 2015, at 2:48 p.m. Sergeant McLeod determined that this photograph was posted to the Facebook account just one minute later at 2:49 p.m. Sergeant McLeod found another photograph on the micro SD card that was taken later that day at 4:14 p.m. of "a pipe in the ground, covered with some cement and dirt with like barrier walls . . . put in for safety," and according to Sergeant McLeod, this photograph was uploaded to the Facebook account about four and one-half hours later at 8:39 p.m. In addition, Sergeant McLeod was again asked about the post "walkin aint no joke" and shown the blown-up picture of the post.

During the course of their investigation, law enforcement sought to search the Defendant's apartment, and the Defendant's fiancée, who was a resident of the apartment, consented. While searching the apartment, law enforcement discovered a

small spiral-bound notebook in a dresser drawer. The journal was lying on top of a pair of men's blue jeans. Two journal entries were signed by "Angie," the first name of the Defendant's fiancée. Other unsigned entries, seemingly in a different handwriting, included the following: "I think that even as a child I knew that I would be a predator. A wolf amongst the sheep. It is who I am. Who I was meant to be"; and "It's like haveing [sic] an itch that you can't scratch. A need to hunt. That's the easiest way to put it." Photographs of these entries, as well as those signed by the Defendant's fiancée, were admitted into evidence.

Corporal Frank Nauss with the Knox County Sheriff's Department worked as "the mailroom supervisor over inmate communications" at the correctional facility where the Defendant was being housed. Corporal Nauss identified a letter dated September 19, 2016, that was sent by inmate Timothy Ison and was signed "Love, Dwayne."

Dr. Darinka Mileusnic-Polchan, the Chief Medical Examiner for Knox County, performed an autopsy of the victim on May 4, 2015. The autopsy revealed that the victim had eleven separate wounds, with three of these wounds being complex wounds that resulted from more than one stab. Dr. Mileusnic-Polchan was also able to ascertain that the wounds were inflicted with a knife having a very sharp blade, a length of six to eight inches, and a width of greater than an inch. Dr. Mileusnic-Polchan concluded that the cause of death was multiple stab wounds and that the manner of death was homicide.

Dr. Mileusnic-Polchan separately described the victim's wounds. One of the victim's wounds started at the top of the victim's right shoulder, penetrated the lower neck region and completely severed the subclavian artery, and went into the right chest cavity and perforated the right lung; this was a lethal wound, in Dr. Mileusnic-Polchan's opinion. Another stab wound entered from the victim's right upper back, broke the scapula, fractured a rib, and deeply penetrated the right lung. Dr. Mileusnic-Polchan testified that this wound would have required "quite a bit of force" to inflict, and it was likewise lethal. A separate but similar wound to the victim's right upper back was also lethal, according to Dr. Mileusnic-Polchan. In addition, the victim suffered a lethal stab wound in her left back that fractured a rib before penetrating her left lung.

Following the conclusion of the proof, the Defendant was convicted as charged of the victim's murder. The jury imposed a sentence of life imprisonment without the possibility of parole, finding that the State had proved beyond a reasonable doubt the aggravating factors of a prior felony conviction involving the use of violence; the murder was especially heinous, atrocious, or cruel and involved torture or serious physical abuse beyond that necessary to cause death; and the murder was committed at random with reasons for the killing that were not obvious or easily understood. See Tenn. Code Ann. § 39-13-204(i)(2), (5), (17). After denial of the Defendant's timely motion for new trial, this appeal followed.

<u>ANALYSIS</u>

*I.       Sufficiency*

The Defendant contends that the evidence adduced at trial was insufficient to support his conviction for first degree premeditated murder.  Specifically, he challenges the element of premeditation, alleging that a finding of premeditation is inconsistent with the jury's finding that the killing was committed at random and that, generally, the proof supporting premeditation was insufficient.  The State responds that the evidence was sufficient, citing to the proof that the Defendant inflicted repeated knife blows on an unarmed victim and produced writings indicative of an intent to harm.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979).  This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State.  <u>See</u> <u>State v. Sheffield</u>, 676 S.W.2d 542, 547 (Tenn. 1984); <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978).  Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury.  <u>See</u> <u>State v. Bland</u>, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict."  <u>Id.</u>; <u>see</u> <u>State v. Tuggle</u>, 639 S.W.2d 913, 914 (Tenn. 1982).  The standard of proof is the same whether the evidence is direct or circumstantial.  <u>State v. Dorantes</u>, 331 S.W.3d 370, 379 (Tenn. 2011).  Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence."  <u>Id.</u> (quoting <u>State v. Hanson</u>, 279 S.W.3d 265, 275 (Tenn. 2009)).  The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State."  <u>State v. Sisk</u>, 343 S.W.3d 60, 67 (Tenn. 2011).

Premeditated first degree murder is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a).

> Premeditation is an act done after the exercise of reflection and judgment. Premeditation means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.

Tenn. Code Ann. § 39-13-202(d) (internal quotations omitted).

The element of premeditation only requires the defendant to think "about a proposed killing before engaging in the homicidal conduct." State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992). The presence of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. Bland, 958 S.W.2d at 660. Our supreme court has held that factors determining the existence of premeditation include, but are not limited to, the following: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, destruction or secretion of evidence of the killing, and calmness immediately after the killing. See State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003); Bland, 958 S.W.2d at 660. Additional factors cited by this court from which a jury may infer premeditation include the lack of provocation by the victim and the defendant's failure to render aid to the victim. See State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000). "Tennessee cases have long recognized that premeditation may be proved by circumstantial evidence" because "premeditation involves the defendant's state of mind, concerning which there is often no direct evidence." Davidson, 121 S.W.3d at 614-15.

First, the circumstances surrounding the killing itself provide evidence of premeditation. "[A]lthough the particular circumstances of each case will differ, stab wounds have been found to be more consistent with a premeditated killing than other types of wounds because the act of stabbing, by its very nature, requires more effort, time, and intimate contact than does simply pulling the trigger of a gun." State v. Adams, 405 S.W.3d 641, 663 (Tenn. 2013); see also State v. Kenny Thomason, No. M2014-00592-CCA-R3-CD, 2016 WL 368200, at *12 (Tenn. Crim. App. Jan. 28, 2016). Such is surely the case here given the nature of the wounds, the force with which the wounds were inflicted, and the multiplicity of the stabs.

According to Dr. Mileunsic-Polchan, the victim suffered eleven stab wounds and at least three of those wounds were complex, being the result of more than one stab. Dr.

- 9 -

Mileusnic-Polchan separately described the victim's wounds, and she opined that four of them were separately lethal. Those four separate stabs severed the victim's subclavian artery, broke her scapula, fractured her ribs, and punctured both the victim's right and left lung. Dr. Mileusnic-Polchan also opined about the substantial level of force that would have been needed to inflict these injuries, and she relayed that the knife used was very sharp and was six to eight inches in length and wider than one inch.

Furthermore, the Defendant made declarations of an intent to kill. The State introduced writings from a notebook recovered from the Defendant's apartment. The notebook was found in a dresser lying on top of a pair of men's pants. In this notebook, the Defendant revealed his belief that he had known since childhood that he was a predator, that he had an itch to hunt, and that this was who he "was meant to be."

Prior to the murder, the Defendant visited a Breadbox convenient store to purchase a can of dip. The cashier thought that the Defendant, who she saw with a knife clipped onto his back pocket, seemed "a little nervous." When the Defendant left the store, he told the cashier "to be safe, watch [her] back." In a Facebook post made around the time of the murder, the Defendant said "walkin aint no joke." Moreover, there is no required amount of time that must elapse between the formation of the intent to kill and the execution of this intent in order to establish premeditation. Cagle v. State, 507 S.W.2d 121, 129 (Tenn. Crim. App. 1971).

Relative to presence of other factors, the victim was unarmed. The Defendant made no attempt to render aid, and he ran from the scene. The knife used to stab the victim was never found. Multiple witnesses testified regarding the Defendant's calm demeanor following the killing. Moreover, the victim did not know the Defendant. She was exercising in the outdoors and engaging in a beloved pastime of many when she was brutally attacked.

The Defendant notes that the jury in rendering its decision to impose a sentence of life without the possibility of parole found beyond a reasonable doubt the presence of the aggravating factor that the murder was committed at random and the reasons for the killing were not obvious or easily understood. See Tenn. Code Ann. § 39-13-204(i)(17). According to the Defendant, this finding is inconsistent with a determination that the killing was premeditated. We decline the Defendant's invitation to find these two concepts mutually exclusive because the Defendant's argument is not supported by law or logic. A senseless, random killing is in no way inapposite to the concept of premeditation; otherwise, only planned assassinations would meet the elements of first degree premeditated murder. Here, we find the proof, in the light most favorable to the State, sufficient to establish that the Defendant premeditatedly and intentionally killed the victim.

*II. Social Media Posts*

The Defendant argues that the trial court should have excluded evidence of the Facebook posts purportedly authored by him. Specifically, the Defendant argues that "[t]he procedure testified to by [Sergeant] McLeod does not demonstrate the requisite authenticity and reliability needed for admission of the Facebook postings that were ascribed by the State to the Defendant, as required by Tennessee Rule of Evidence 901." The State responds that there was sufficient evidence to authenticate the Facebook posts and attribute them to the Defendant. We agree with the State.

Tennessee Rule of Evidence 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Evidence may be authenticated through "[t]estimony that a matter is what it is claimed to be" or "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." Tenn. R. Evid. 901(b)(1), (4).

During Sergeant McLeod's direct testimony, defense counsel lodged a hearsay objection to the Facebook records. However, the trial court allowed the printout of the Facebook account to be admitted into evidence, as well as a blown-up picture of the last post, concluding that the evidence had been properly authenticated by Sergeant McLeod. Although the trial court allowed the printout into evidence, the trial court did not, at that time, allow Sergeant McLeod to testify regarding details surrounding the posts.

During a jury-out proceeding that occurred on the next morning of trial, the admissibility of the Facebook records was revisited, specifically whether the State would be allowed to question Sergeant McLeod about the contents of the Facebook records, such as placing the seven-hour time reference into context and providing identifying information regarding two Facebook photographs on the account. The trial court initially observed that it had previously dealt with this issue in a case involving defendant Jabriel Linzy and that Linzy's case was still pending on appeal. The Defendant objected to admission of the Facebook records in their entirety, arguing that in order for the evidence to be properly admissible, someone from Facebook needed to be present to authenticate the records given that it was possible for an account to be "hacked."

The State averred that the Facebook account reflected the name "Dwayne Ison," that it listed the Defendant's birthdate for the account user, and that the profile picture for

the account was a photograph of the Defendant's son. The State maintained that it would be able to show that some of the posts on the Facebook account were sourced from the Defendant's cell phone, which would provide "sufficient authentication." The State explained that two photographs taken on April 30, 2015, just days before the murder, were found on the Defendant's phone, and that these two photographs were uploaded to the Facebook account that same day—one just a minute after being taken, and the other about four and one-half hours later.

The State further indicated that it would be able to establish that the Facebook post "walking ain't no joke" was made around 7:00 p.m. on May 3, 2015, just twenty to thirty minutes before the victim was murdered. The State surmised that the content of this post provided sufficient circumstantial evidence that it was authored by the Defendant and, thus, was authentic. Additionally, Sergeant McLeod would testify that the Facebook account was logged into on that day from the Defendant's phone, according to the State, which provided an additional circumstance in favor of admissibility.

The State surmised that all of this evidence taken together was "more than sufficient to meet the burden of admissibility." The State averred that any argument thereafter about authorship went only to the weight of the evidence.

The defense replied that it was a matter of admissibility of the evidence, not simply weight, because Facebook accounts could be hacked. According to the defense, it was not proper to admit evidence from Facebook accounts "on a hearsay basis." The defense averred that Facebook evidence should only be admitted if a records keeper for Facebook were called to testify and the records keeper said that the evidence came from "the proper account" and provided the actual IP address used to access the account. According to the defense, without some record from the social media provider, the evidence amounted to inadmissible hearsay.

The State indicated that the Facebook post was deleted before a search warrant could be obtained for the account. The trial court noted its concern that the printout of the post "walking ain't no joke" reflected a time reference of seven hours ago but did not mention any specific day, time, or hour. The trial court cautioned, "[Y]ou're having to prove a length of time by what the [officer] says that he saw on a screen—time which doesn't appear on the document that you're trying to introduce." The trial court was not inclined to allow Sergeant McLeod to place the time reference into context, but it nonetheless agreed to hear testimony from Sergeant McLeod.

Sergeant McLeod explained that immediately following his interview of the Defendant, he searched for the Defendant's Facebook profile, and several hours later, he made a printout of its contents. When Sergeant McLeod initially looked at the account and observed the "walkin aint no joke" post, it was time-stamped 7:06 p.m. May 3, 2015.

However, when Sergeant McLeod later printed the post from the Facebook account around 2:00 a.m. the following morning, the post reflected a time-stamp of having occurred seven hours earlier, but no longer was a specific time reference provided. Sergeant McLeod explained that in experience with Facebook, time references for posts sometimes change as time elapses: "Over time things will show a day ago, a week ago, a month ago so that the detail time on some items change."

In addition, Sergeant McLeod stated that after he downloaded the contents of the micro SD card from the Defendant's phone, he discovered a photograph of an underground pipe, which bore a time-stamp of 4:14 p.m. on April 30, 2015. Sergeant McLeod relayed that this photograph was uploaded to the Facebook account about four and one-half hours later at 8:39 p.m. After Sergeant McLeod was shown a second photograph, but before he was asked any questions, the trial court interjected and ruled that the proffered evidence from the Facebook account was admissible. However, the trial court qualified, "You can talk about this is the record, that's the evidence, but you're not going to talk about a time that appeared on the screen that's now not a part of the record."[1] Both photographs were then entered into the record. The trial court indicated that the State would be able to cover the information on redirect, and the State did indeed cover such information during Sergeant McLeod's redirect examination as detailed in the factual background above.

On appeal, the Defendant acknowledges cases from this court that hold contrary to his proposition that the trial court committed error in this case: State v. Jabriel Linzy, No. E2016-01052-CCA-R3-CD, 2017 WL 3575871 (Tenn. Crim. App. Aug. 18, 2017), (concluding that evidence of social media posts was properly authenticated based upon testimony by several witnesses tying evidence from the Twitter and Facebook accounts to the defendant); and State v. Vermaine M. Burns, No. M2014-00357-CCA-R3-CD, 2015 WL 2105543 (Tenn. Crim. App. May 5, 2015) (holding that there was sufficient circumstantial evidence to authenticate Facebook chats and email). The Linzy defendant was specifically referenced by the trial court in this case, the trial court's having issued both rulings. Linzy has since been decided by this court adversely to the Defendant.

First, in Burns, a sex offense case, the defendant argued that Facebook chats and emails containing a photo of a penis were not properly authenticated "because the State failed to exclude the possibility that someone else authored the messages." 2015 WL 2105543, at *10. In analyzing the issue, the Burns court compared the facts of that case

---

[1] A minute entry from May 10, 2017, is contained in technical record. It reflects that after the Defendant's oral motion that the State not be allowed to introduce "Facebook posts" came on for a hearing, the trial court denied the Defendant's motion but ordered the State not to "refer to the time-stamp being hours before the victim's death."

to the facts of cases from other jurisdictions who dealt with similar authentication issues regarding social media. Id. at \*11-12 (collecting cases). Many of the cases cited therein held that evidence from social media and emails was properly authenticated when the prosecution offered corroborating circumstantial evidence; and the Burns court, after engaging in a fact specific analysis, similarly concluded that there was "sufficient circumstantial evidence to authenticate the Facebook chats and emails in question." Id. Furthermore, the Burns court observed that "[t]o the extent that the [d]efendant argues that the State was required to affirmatively prove that the [d]efendant was the author of the message, we agree with reasoning from other jurisdictions that such challenge goes to the weight of the evidence, not its admissibility." Id. at \*12 (citing Tienda v. State, 358 S.W.3d 633, 646 (Tex. Crim. App. 2012); Commonwealth v. Purdy, 945 N.E.2d 372, 381-82 (Mass. 2011); People v. Clevenstine, 891 N.Y.S.2d 511, 514 (N.Y. App. Div. 2009)).

In Linzy, a murder and attempted murder case, the State sought to introduce messages found on Facebook and Twitter that reflected the defendant and the victim were members of rival gangs and that the defendant had issued threats against the victim. 2017 WL 3575871, at \*13. The defendant argued that the comments could not be attributed to him; in other words, the comments could not be authenticated. Id. at \*11. This court stated that "evidence from social media and emails was authenticated when the prosecution offered corroborating circumstantial evidence." Id. at \*12. The corroborating circumstantial evidence consisted of testimony from witnesses who were familiar with the defendant's and the victim's Twitter accounts, and a witness who had seen certain photographs on the defendant's and the victim's Facebook pages. Id. at \*13.

"Determining whether social media evidence has been authenticated requires fact specific analysis." Linzy, 2017 WL 3575871, at \*12. Here, Sergeant McLeod performed a search of the Defendant's cell phone and located a Facebook account reflecting the name "Dwayne Ison" and listing the Defendant's birthdate. The profile picture for the account was a photograph of the Defendant's son. Following forensic analysis of the Defendant's phone, Sergeant McLeod discovered that a photograph had been taken underground of "a cut pipe, mud, and water," that the photograph had a time and date stamp of April 30, 2015 at 2:48 p.m., and that the photograph was uploaded from the phone to the Facebook account at 2:49 p.m. Sergeant McLeod found another photograph taken later that day at 4:14 p.m. of "a pipe in the ground, covered with some cement and dirt with like barrier walls . . . put in for safety," and this photograph was uploaded to the Facebook account about four and one-half hours later at 8:39 p.m.

The incriminating post from the Facebook account came several days later—that being "walkin aint no joke." There was evidence that the Defendant was walking near the time the post was made and the victim was killed. Sergeant McLeod testified that on

- 14 -

May 3, 2015, the Facebook account was accessed "through [the Defendant's] Chrome user" via the phone.

The State put forth sufficient circumstantial evidence connecting the Defendant to the Facebook account and that the Facebook page was accessed from the Defendant's phone. The Defendant had an opportunity to cross-examine Sergeant McLeod. The Defendant makes no attempt to factually distinguish his case from Burns or Linzy. We hold, as we did in Burns and Linzy, that any argument someone other than the Defendant could have authored these social media posts was a matter of the weight of the evidence. Accordingly, we conclude that there was circumstantial evidence to authenticate the Facebook account records, and the trial court did not err in admitting the evidence.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE